By the Court, Sanderson, C. J.
This is an action of ejectment. The case was tried in the Court below without a jury. The plaintiff had judgment, ■and the defendant appeals. The facts as found by the Court are acquiesced in by both parties, and the question to be determined is whether the 2>laintiff, upon those facts, is entitled to recover the land in controversy.
. The findings are as follows: “ First—That in January, 1862, the plaintiff obtained from the State of California a patent *621 for the land in controversy, pursuant to the several Acts for the disposal of the five hundred thousand acres of land granted by the United States to the State of California.
“ Second—That the plaintiff and those under whom he claims have been in possession by in closure and cultivation of all the land embraced in said patent, excejot the forty acres in controversy, since the year 1852, but neither he nor they have ever been in possession of any part of the land sued for.
“ Third—That in 1854, after the public lands of which the premises are a part had been divided into townships, and before they had been sectionized, the plaintiff located two school land warrants under the Act of 1852. This location embraced the premises in controversy, and the lands for which the patent issued to him subsequently. The location was made by the County Surveyor of San Joaquin County, by actual survey, and the survey was duly recorded in the San Joaquin County Clerk’s office, in November, 1854.
“ Fourth—On the 14th day of May, 1856, plaintiff made the location and filed the warrants in the United States Land Office at Marysville.
“Fifth—The defendant, a citizen of the United States, settled upon that portion of the land in controversy, which is a part of the northwest quarter of section twenty-one, in October, 1853, and erected a dwelling house, with intent to secure a pre-emption right to a quarter section under the Acts of Congress of September, 1841, and March, 1S53. The land at that time was unsurveyed, and ever since that time defendant has occupied and cultivated that portion of the northwest quarter of said section which is now in controversy.
“ Sixth—In the month of May or June, 1855, the land was divided into sections and other legal subdivisions by the United States Government, and the defendant, on the 2d day of October, 1855, filed his declaratory statement for said quarter section in the Land Office at Benicia, to which district the land belonged, the plat or survey of the land not having been entered and filed in said office.
“Seventh—The land in controversy was afterwards trans *622 ferred to the Marysville District, and the defendant, after the return of the approved plat or survey to the Marysville office, filed in that office his declaratory statement, in due form of law, on the 16th day of April, 1856.
“Eighth—In 1860, at the Land Office in Stockton, (to which district the land then belonged,) the defendant made proof of his settlement and pre-emption, and having made payment for said quarter section, received from the Register and Receiver a certificate of location and purchase of the same in due form of law.
“Ninth—One John H. Megerle, now deceased, and whose heir-at-law and representative is the defendant, in the month of October, 1853, settled U230n that portion of the land in controversy embraced in the southwest quarter of said section twenty-one, and erected a house thereon, intending to preempt the same under the laws of Congress, the land being unsurveyed public land, and continued reside on and cultivate the same until 1858, when he'íliédJ y '<_•
“Tenth—The land being sectioni^ed, and'the plats returned to the Marysville Land Office, said-’Sqhn HJMdgerle, while yet in life, to wit: on the’ 1 Otbyday of April,T856, filed in said Marysville office his declsratofysstatement for a quarter section of land embracing the^est^half o£-’the southwest quarter of said section twenty-onefancUi#''' April 1859, proof was made of the entry and settlement of the said John H. Megerle, and of hi's notice before the proper land officers, and the defendant has been thence hitherto ready and willing to make payment therefor.
“Eleventh—The defendant was in possession of the land in controversy, adversely to the plaintiff, at the time this action was brought.
“ Twelfth—That the plaintiff, claiming the quarter section of land on which the defendant settled by virtue of his location of said school warrants, did contest the right of the said defendant before the officers of the Stockton Land Office to pre-empt the same, and thereupon such proceedings were had before the officers of the Grovernment of the United States in *623 the matter of said contest, as that the Secretary of the Interior, on the 9th day of December, 1859, and again on the 14th day of June, 1861, did adjudge and determine that the said defendant had a valid legal right to said quarter section under the pre-emption laws of the United States.”
The eighth section of an Act of Congress passed September 4th, 1841, entitled “An Act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights,” reads as follows:
“ Sec. 8. There shall be granted to each State specified in the first section of this Act five hundred thousand acres of land, for purposes of internal improvements; provided, that to each of the said States which has already received grants for said purpose there is hereby granted no more than a quantity of land which shall, together with the amount such State has already received as aforesaid, make five hundred thousand acres; the selects their limits, thereof slial, tional divis: n^lOf^said States to be made within ¡D^Pvely, m áfach a manner as the Legislature r fit, andJ^éíltócWn parcels conformably to secs anr^, sifbenvisions'of not less than three hundred and tweitty.Acres in ^0? tmi location, on any public land except such aids or íiS^bej&ferved from sale by any laws of Congress or proc^mati^jkajfihe President of the United States; which said location may be made at any time after the lands of the United States in said States respectively shall have been surveyed according to existing laws. And there shall be and hereby is granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land as, including such quantity as may have been granted to such State before its admission and while under a Territorial Government, for purposes of internal improvements, as aforesaid, as shall make five hundred thousand acres of land, to be selected and located as aforesaid.”
Under the last clause of the foregoing section, California, upon her admission into the Union, became vested with an interest in the public lands within her borders to the extent *624 of five hundred thousand acres, (having never received any previous grants,) the same, however, to be selected and located in the manner and at the time specified in the immediately preceding part of the section, to which the words at the close of the section “to be selected and located as aforesaid,” directly refer. The words “to be selected and located as aforesaid,” in our judgment, include both the manner and the time of the selection and location, and not the manner merely, as was held in Doll v. Meador, 16 Cal. 315. The language is not that the land shall be selected in the manner as aforesaid, but “ as aforesaid.” That portion of the section to which the words “ as aforesaid” refer, prescribes not only the manner of the selection, but the time also, and by no rule of construction can it be said that they refer to the one and not to the other. There is no ambiguity in the language usedon the contrary, the meaning is too plain and obvious to admit of doubt. The language is “located as aforesaid,” that is to say, in parcels of not less than three hundred and twenty acres, conformably to sectional divisions and subdivisions, and after the survey has been made. This construction is not only justified by the natural and grammatical import and meaning of the language used, but is sustained by the necessities of the subject matter. The land must be located in parcels, conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres. How can this be done until after the lands have been surveyed by the proper officers of the Federal Government ? The grant imposes conditions as to the quantity, manner of selection and location, and time of location, and under it no title to any specific land can vest in the State until all of those conditions have been complied with. The State has no more right to select and locate lands before the survey has been made, than she has to locate it in tracts of a hundred and sixty acres each, or without regard to the sectional divisions and subdivisions of the United States survey. The mode; time, and quantity of the selection and location are fixed by the Act. All else is left to the legislative wisdom of the State. Agents may be appointed by the State for the purpose of select *625 ing and locating the land granted to the State, and certifying the same by proper lists to the proper land officers of the Federal Government. Bat such selections and locations must be made upon lands to which there is no subsisting valid claim, by pre-emption or otherwise, or they cannot be recognized and upheld as valid by the Federal Government. The approval of the Federal Government must be had before the title of the State can attach to any specific land, and such approval ought not and cannot be had where there is a valid subsisting claim, under the laws of Congress, by pre-emption or otherwise, which has attached to the land before the selection is made by the State. This course is made necessary in order to preserve uniformity in the land system of the Federal Government, and to enable it to preserve intact its policy toward actual settlers upon the public lands. The uniform policy of the Federal Government has been to invite and encourage the settlement of her public lands by a judicious system of preemption laws, whereby settlers are enabled to secure the title to the land cultivated and improved by them in preference to all others. A pre-emptioner is as much the favored beneficiary of the Federal Government as a State, and equally entitled to her protection. The unoccupied land is as open to the settlement of the pre-emptor as to the selection and location of a State, and when he has once placed his foot upon the spot of his choice he cannot be deprived of it by any system of State selection and location, provided he complies with the laws of Congress; nor need he look elsewhere than to the Federal Government for his title. Upon land in the possession of a bona fide pre-emptioner the State can make no valid selection and location, nor can it convey any valid title therein to another. Such land has a prior valid claim upon it and is not subject to State selection. Any other theory would lead to confusion and to Federal and State conflict. So careful is the Federal Government of the rights of pre-emptioners that it has provided that where any settlement, by the erection of a dwelling house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections *626 granted for the purposes of public schools, other lands shall be selected by the proper officers of the State in lieu thereof. (Act of March 3, 1853, Sec. 7, Wood’s Digest, p. 749.)
The sixth section of the Act just cited provides, “ that all the public lands in the State of California, whether surveyed or unsurveyed, with the exception of sections sixteen and thirty-six, which shall be and are hereby granted to the State for the purposes of public schools, in each township, and with the exception of lands appropriated under the authority of this Act, or reserved by competent authority, and excepting also the lands claimed under any foreign grant or title, and the mineral lands, shall be subject to the pre-emption law of the 4th of September, 1841, with all the exceptions, conditions, and limitations therein, except as herein otherwise provided ; and shall, after the plats thereof are returned to the office of the Register, be offered for sale, after six months public notice in the State of the time and place of the sale, under the laws, rules, and regulations now governing such sales, or such as may be hereafter prescribed; provided, that where unsurveyed lands are claimed by pre-emption, the usual notice of such claim shall be filed within three months after the return of the plats of surveys to the land offices, and proof and payment shall be made prior to the day appointed by the President’s proclamation for the commencement of the sale, including the entry of such claims to be made by legal subdivisions, according to the United States survey, and in the most compact form.”
Under the provisions of this section the defendant proceeded to obtain the title of the United States to the land in controversy. He settled upon it in October, 1853, seven months after the passage of the Act, with the intent to secure a pre-emption right thereto. At that time the land was vacant and unoccupied. He erected a dwelling house thereon, and ever since that time has resided thereon and cultivated the same. In 1854 the land was surveyed and divided into townships, and in 1855 into sections and other legal subdivisions, by the Federal Government. The defendant, within *627 the time prescribed by the laws of Congress, to wit: on the 16th day of April, 1856, filed in the proper Land Office his declaratory statement, and within the time prescribed made proof of settlement and payment of the purchase money; and, in 1860, obtained from the proper officer a certificate of location and purchase, in due form of law, of the land in controversy.
The plaintiff, on the contrary, sought to obtain title through the State, and under its laws. In 1854, after the land was divided into townships, and before it was divided into sections and other legal subdivisions, and before the plats were returned to the proper office, the plaintiff took his first step toward obtaining his title, by locating two school land warrants pursuant to the provisions of the Act of the State Legislature of 1852. On the 14th day of May, 1856, the plaintiff made his location and filed his warrants in the United States Land Office, and in January, 1862, he obtained a patent from the State for the same land.
Thus it appears that the defendant was in possession as a pre-emptioner before and at the time at which the plaintiff located his warrants; and the declaratory statement of the defendant was on file in the proper Land Office before and at the time the plaintiff entered his location and filed his warrants. It further appears that under these circumstances the plaintiff contested the right and claim of the defendant before the officers of the proper Land Office, and, on appeal to the Secretary of the Interior, a decision was twice rendered against him, and establishing the validity of the defendant’s claim; yet, by some means which do not appear, he after-wards, and after the defendant had obtained his certificate of location and purchase from the proper officers of the Federal Government, obtained his patent from the State of California.
Regarding the plaintiff as the agent of the State for the purpose of selecting and locating the land in question, as is claimed by his counsel, and which we concede, he made his selection and location upon land to which the defendant’s pre *628 emption right had already attached. This, as we have already seen, he could not do, and by his acts the State acquired no title whatever to the land in controversy, and of course could pass none to him by her patent. When two or more persons have settled upon the same quarter sections of land, the right of pre-emption is in him who made the first settlement. (Act of Sept. 4, 1841, Sec. 11.) The State occupies no better or stronger position than a bona fide pre-emptioner; and if her selection be subsequent to that of a bona fide pre-emptioner, her right must yield to his.
The only question remaining is, whether under the circumstances of this case the defendant can attack the plaintiff’s patent; and upon this point there can be no doubt, if our previous reasoning be correct. By his certificate of location and purchase, the defendant became vested with the title of the United States to the land in question, upon which he could maintain and defend an action of ejectment under the laws of this State. (Wood’s Dig. p. 1044.) We have also shown that the State acquired no title to the land in question by the acts of her agent, the plaintiff in this case, because, at the time of his location, the land was reserved from selection by the preemption laws of the United States, and that therefore the title of the State did not attach to the land in question, and nothing passed to plaintiff by her patent.
The third section of the Act of the Legislature which authorizes the location of school land warrants, and under which the jalaintiff made his location, provides as follows :
“ Sec. 3. The parties purchasing such warrants, and then-assigns, are hereby authorized in behalf of this State to locate the same upon any vacant and unapxoropriated lands belonging to the United States within the State of California, subject to such location; but no such location shall be made unless it be made in conformity to the law of Congress, which law provides that not less than three hundred and twenty acres shall be located in one body.”
By necessary implication, the purchaser and his assignee is *629 prohibited from locating the warrants upon land which is already occupied. We have, therefore, a case where the State has issued a patent without having any title to the land, and contrary to the provisions of one of its own statutes.
In Patterson v. Winn, 11 Wheat. 380, the Supreme Court of the United States said: “We may, therefore, assume, as the settled doctrine of this Court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or the State had no title, it may be impeached collaterally in a Court of law in an action of ejectment.”
The doctrine of Patterson v. Winn is expressly recognized and approved in Boll v. Meador, 16 Cal. 324, and Mr. Chief Justice Field there said: “We admit, in general terms, the correctness of the doctrine declared in Patterson v. Winn to be the settled doctrine of the Supreme Court of the United States,-that if a patent be absolutely void upon its face, or were issued without authority, or were prohibited by statute, or the State had no title, it may be impeached collaterally in an action of ejectment.” Subsequently, in the same opinion, Mr. Chief Justice Field declares by whom, in such cases, a patent may be impeached, and by whom not, in the following language: “ Nor do we question the further proposition, that the defendant might have disproved the evidence of title furnished by the patent, by showing that the land in question was not included in the Act of Congress, or was within the exceptions contained in the Act of this State. We only annex to the proposition the qualification that to do this he must first have brought himself in some privity with the common source of title. If he were a mere intruder, not possessing any claim of title either from the General or State Government, he would not be in a position to question the regularity and correctness of the action of the officers of the State in the selection of the lands and the issuance of the patent.”
In the present case, as we have endeavored to show, we have two grounds upon which a patent may be impeached collaterally in an action of ejectment; and a party who, by *630 reason of Ms privity with the common source of title, has a status in Court which enables Mm to question its validity.
The judgment is reversed, and the Court below directed to enter a judgment upon the findings in favor of the defendant.